[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This matter comes before the court by writ returnable on October 15, 1996. The plaintiff brings this action seeking, by amended complaint, a dissolution of marriage and other relief.
The parties were married in Dexter, Maine on June 1, 1974. Both parties have resided in the State of Connecticut for more than one year prior to the commencement of the action. Five children have been born to the wife since the date of the marriage, all of whom are issue of the marriage. Four of the children remain minors: Leigh Ann Clukey, born February 27, 1991, Alison Renee Clukey, born November 6, 1984, Paul Thomas Clukey born March 16, 1987 and Janna Susan Clukey, born May 9, 1988. Monica Jill Clukey, the oldest daughter, is eighteen years of age CT Page 8568 and has just completed high school. Throughout the court proceedings she was a minor or a full-time unmarried student in her mother's household. Her participation in the family dynamic cannot be ignored simply because of her age of majority.
This family has not received public assistance.
For the reasons discussed hereinafter, the court finds that the marriage between the parties has broken down irretrievably and there is no hope of its reconciliation.
The parties have each submitted claims for relief. The plaintiff, by way of financial relief seeks child support, alimony, health insurance coverage, life insurance coverage, counsel fees and a specific division of the parties' assets. The defendant, by way of financial relief acknowledges a duty to pay child support, alimony, provide medical insurance for the minor children, and seeks a specific division of the marital assets. It would seem that there would be little to argue about. However, the plaintiff and the defendant provide such extraordinarily disparate views on these issues that one might hardly believe they speak of the same family and family holdings.
The children are represented by counsel. Throughout the pendente lite period and at the commencement of trial there was no agreement between the parties as to the issue of custody. Subsumed within the term custody was the parties' disagreement over decision makers for the children and time that the children would be with each parent. After the commencement of the trial, on the second day of testimony, the parents and minor children's attorney presented a custody and visitation agreement, signed by the parents and the children's attorney. Certain provisions in the agreement, referenced later in this opinion, were not acceptable to the court in the absence of sufficient evidence to satisfy the court that those provisions were in the best interest of the Clukey children. The court did not accept the agreement at that time but ruled that it would be considered after the conclusion of the fully contested trial. Counsel for the minor children has submitted claims for relief, as well. She seeks an acceptance and ordering of that agreement for the children, payment of her bill as submitted, payment of fees of Dr. Collins, a psychologist who performed a psychological evaluation of the family, and support orders to meet the household needs of the children's home. CT Page 8569
The plaintiff, Genevieve Susan Clukey is 44 years old[1]. She was 20 years old at the time of her marriage to the defendant. She is a high school graduate. She was trained as a medical technician. She has not worked in the marketplace since the birth of the parties' first child in 1979, approximately nineteen years ago. She has been a full time homemaker for all of those years and remains so today. She has been out of the marketplace for so long that her previous job skills simply would be inapplicable and lost to today's world. Her prospects for future employment require further education or job training to ultimately hope to be employed at anything beyond the most modest level of remuneration or complexity of skill.
Currently her household is comprised of herself and the parties' five children (the oldest will shortly be off to college). The four minor children range in age from 17 to 10. The plaintiff's physical health is good. She has had some emotional stress over the last few years and has treated with a therapist. She is not medicated.
The defendant, Thomas Clukey is 46 years old. He is a college graduate and a graduate of chiropractic medical school. He is a licensed chiropractor and practices his profession full-time. He has been a chiropractor since 1980. He has had his own practice since 1984. He has always worked in Cheshire, Connecticut. The defendant is in good health.
These people met in Dexter, Maine when the plaintiff was 17 years old and the defendant was 19 years old. Prior to their marriage, while they were dating, the plaintiff moved in with the defendant's parents while he completed his senior year of college — at University of Connecticut, Storrs. Thereafter, they married. The parties lived briefly in Naugatuck, both working. They moved to Oregon so that Dr. Clukey could attend chiropractic school. For the entire time of his education, the plaintiff worked and was the sole support of the family. When the defendant finished school, he also worked while awaiting his board exams and their results. He failed to pass the Oregon boards. Ultimately, the parties moved back to Connecticut so that the defendant could practice chiropractic medicine in Connecticut. It was not a move that the plaintiff supported; however, the parties proceeded with the plan, anyway. The defendant passed his boards in Connecticut and became established in his field in Connecticut.
The practice of chiropractic medicine was very successful for CT Page 8570 Dr. Clukey until the early 1990's. He saw a steady increase in both his patient caseload and his net income. From the fruits of these efforts, the Clukey family enjoyed a comfortable lifestyle. They were able to go about the business of raising five children, paying for all of their extras, building a healthy retirement fund, an investment portfolio, a valuable residence and enjoy numerous real estate ventures. Throughout these years Mrs. Clukey devoted herself to child-rearing and homemaking. She testified to a daily schedule that had her working at full speed from rising until evening each day.
While there were no economic difficulties in these years of the 1980's and early 1990's, there were occasional tensions between the parties. In the early 1990's, things became more difficult. Dr. Clukey criticized his wife for drinking too much alcohol and embarrassing him in public scenes, especially when traveling. He was also very critical of her smoking marijuana, which he believes continues to the present day. Mrs. Clukey felt her husband criticized her too much, putting her down, demeaning her. There was not a lot of communication. Dr. Clukey became increasingly invested in his business, both in the time he devoted to it and in his rising concern over the impact of managed care on his revenues and overhead costs. He stated that he stopped smoking marijuana when he became very busy with his business. Mrs. Clukey states that his use tapered but did not end.
 I. Custody and visitation issues
Prior to the parties' separation, the family functioned as an integrated unit with no significant tension between the children and either parent. Upon Dr. Clukey's initial removal of himself from the home, he came back daily to partake in the family evening plans. This terminated ultimately because the plaintiff became painfully aware that her husband was not interest in marital reconciliation.
Thereafter, Dr. Clukey's relationship with his children decayed and disintegrated. Each parent bears responsibility for this. The plaintiff poisoned the children against their father. She informed them that he had abandoned them. She consciously and deliberately destroyed the security they'd had in their relationship with their father. Ms. Clukey's own upset and anger at the loss of her marriage caused her to act in a manner detrimental to the emotional health, security and stability of CT Page 8571 her children.
Dr. Clukey's response to those problems in his relationship with his children was equally destructive to them. He was physically assaultive and verbally abusive and critical of the children. He forgot that they were children, physically and emotionally. Rather than assuming a caring, concerned, nurturing and protective parental role, he struck out at his children for their rejection of him. He failed, also, to shield them from criticism of their mother, who they perceived as the focus of their security.
This behavior of each parent continued in a cycle so destructive that the parties now face a situation where each of their children evidences real signs of psychological disturbance.
The children's ages in relation to each other and their parents is worthy of note. Monica is no longer a minor, although she was through much of the divorce proceedings and contributed to the family dynamics. She is 18 years old and is going on to college. She has been the closest to her father, living with him for a period of time. They are presently alienated to some extent over financial issues and how they affect their relationship. Monica is closest in age to Leigh, who is now 17. Janna is the youngest at 10 and Paul, the only boy, is 11 years old. Alison the middle child is 14 years old.
Alison, in November 1997, deliberately cut her wrists. Her academics have degraded. Nothing has been done by the Clukey family to initiate counseling for this child. Her suicide attempt may not have been life-threatening but it is not the behavior of a happy, secure child.
Paul, a child who suffers from some attention deficits, expressed significant upset in psychological evaluation. He wants to be with his father more, but also has discipline problems when with him.
Janna, the youngest, appears the least upset in the family. All agree she receives the "best" attention of the family.
Leigh at 17 wishes neither parent to impose controls on her. She has been ill for the better part of a year with mononucleosis and is now ready to resume her normal activities. CT Page 8572
These children over the pendente lite period have been empowered to determine when they will see their father. This court finds that no good has come of this. It has provided them a tool to manipulate their parents to gain what they perceive to be what they want, not necessarily what they need.
The court disapproves of the custody and visitation agreement between the parties dated May 20, 1998 because the court finds it not to be in the best interests of the parties' children.
This agreement in salient part:
(1) gives Genevieve Clukey sole custody of the children; and
(2) provides the children may visit with their father as they may initiate and choose; and
(3) the family is to engage in family therapy with the right to have the court orders reviewed after 90 days and twelve therapy sessions.
This court, based upon all of the evidence, finds that it is in the minor children's best interest that they have a definite schedule of visitation with their father. The structure of specific dates and times provides reliability to all involved and removes the dynamic of scheduling from the panoply of tools available to this family for testing each other.
This court has listened to the testimony of both parties and Dr. John Collins, as well as reviewing his report and addendum.
The children, with the exception of Janna, are firmly opposed to a set schedule of visitation with their father. It is apparent that when one is imposed there will be resistance. Ms. Clukey must be prepared to impose appropriate discipline to encourage the children's compliance with these orders. One of Ms. Clukey's challenges as a parent has been in maintaining herself as a consistent and even handed disciplinarian. Her style has been to give up on discipline in the face of dissension. She does not want to be unpopular with her children.
These parents cannot function as joint decision makers. They barely speak and when they do it is often "last minute" and hostile. The court finds that the statutory presumption in favor of joint custody is overcome here. CT Page 8573
Ms. Clukey as the residential parent functions as the sole custodian of these children, when she has not surrendered the decision making to them.
The record is replete with instances between the parties demonstrating the inability to communicate. Perhaps the most poignant is the tale about the steps necessary to fully engage this family into therapy with Drs. Kyle and Marsha Kline Pruitt. Both parties agree the therapy is necessary. They fervently disagreed, and litigated at length as to who dropped the ball in getting all the arrangements made. The most basic level of conversation between the parties would have solved the problem without recrimination or rancor.
 II. Assets/Liabilities A. Defendant's Chiropractic Practice and other business interests (and earnings issues)
Dr. Clukey's chiropractic practice has two components. He is the sole owner of Thomas F. Clukey, D.C. P.C. That practice has been in operation since 1984. In late 1994, he commenced his involvement in a corporate entity now known as Multicare Physicians Rehabilitation Group, P.C. (Multicare).
Thomas Clukey and his two brothers, Ronald and David, each have individual chiropractic practices. In the early 1990's, they became concerned that their respective livelihoods were at risk because of the adverse effect of insurance companies management of health care benefits to their patients. Managed care has eliminated or put caps (where none existed or were substantially lighter) on payment, the number of times the chiropractor can see a patient for a malady or in general the amount to be charged for a procedure, the ability to charge separately for individual procedures, well-care, and the like. Further, administrative costs associated with managed care were escalating. The brothers made a business decision that economically, they would each be better off if a part of their respective labors as chiropractors were performed in the contest of a medical services organization rather than in their individual businesses. They also perceived that the medical services corporation would umbrella in other health care providers for a one-stop operation for their patients. This business strategy, which was modeled on others they had read of, was the genesis of Multicare. Connecticut law CT Page 8574 does not allow such a corporation's stock to be owned by anyone other then a medical doctor Connecticut General Statutes
section 33-320a (as of the time of incorporation in 1994). The attorney initially responsible for the work of incorporation hooked them up with a medical doctor who performed this "service" of stock ownership for a modest price. This arrangement continued while a friend (and fellow chiropractor) of the defendant and his brothers, Neil Sloane, became a medical doctor and took over the responsibilities. Neil Sloane has title ownership of all the stock of Multicare. He has not participated in any respect in its business, oversight of its operations, review of its corporate responsibility, review of patients' charts, or the like. Neil Sloane has received no compensation. He hoped to work at Multicare in undetermined employment, but there is no agreement. He acknowledged that this is something to be negotiated with Dr. Ronald Clukey, the defendant's brother.
The defendant and his two brothers determine how Multicare funds are spent. They determine how much they should each be paid, if anything. Indeed, they decide which patients they will see under Multicare and their respective individual practices. Neil Sloane does not participate in any way in the decision making. The defendant and his brothers determined that the prior doctor (Alan Cohen) would no longer hold their stock and that Neil Sloane would do so. The incorporation papers of Multicare require the physician owner to consult with others; however, in practice, this mere consultation has been, in reality, an absolute relinquishment of all indicia of ownership and control to the defendant and his two brothers.
The affairs of the Multicare corporation are in the control of the defendant and his brothers. They have fashioned an arrangement that Multicare contracts for the administration of its books and records with T.R.D. Medical Office Management, Inc. (TRD), a management services organization. TRD, which started in 1994, shares are owned, one-third each, by the defendant and his two brothers.
The parties each provided expert testimony as to the value of the defendant's chiropractic practice. The key to the major difference in their respective valuations can be found in the title to the reports submitted as evidence. Plaintiff's expert, Kenneth Pia, submitted a summary valuation report of the chiropractic practice of Thomas F. Clukey at or near December 31, 1997. The defendant's expert, Mark Harrison, submitted a CT Page 8575 valuation report of Thomas F. Clukey's 100% ownership interest in the chiropractic practice of Thomas F. Clukey, D.C., P.C., December 31, 1997. Essentially, then, the difference in approach is that Mr. Pia assigned a value to all of the defendant's chiropractic practice, including the work done for both the professional corporation and the work done for Multicare. His reasoning for doing so is threefold. First, Multicare is solely controlled by the defendant and his two brothers. Second, all of the profits of the individual chiropractic offices flow back to each individual Clukey through Multicare and other entities (e.g. TRD) made up exclusively of the individual Clukeys. The third reason for including the defendant's practice with Multicare is that "[w]hile each Clukey brother has methodically shifted revenues from their individual chiropractic practices to Multicare since 1994, the identity of each chiropractic practice has been preserved." (Exhibit GG, p. 3).
There are, generally speaking, three methods of valuation of a business: 1) an asset based approach, 2) an earnings based approach, and 3) a revenue based approach. (See both experts' reports for more complete definitions; they are consistent with each other.) These two fine experts managed to utilize different approaches and come to disparate conclusions. Mr. Pia has valued the chiropractic practice at $164,000 as of December 31, 1994. He relied largely on the capitalization of earnings method of valuation. He also considered secondarily, the gross revenue multiple method. The approach that Mr. Harrison has taken is to value the professional corporation only. He relied largely on the net asset valuation method. He found that there was no significant intangible assets in the business, noting the significant reduction in income. Mr. Harrison has valued the defendant's 100% interest in the professional corporation at $58,500 as of December 31, 1997. "In assessing the value of . . . property . . . the trier arrives at his own conclusions by weighing the opinions of the appraisers, the claims of the parties, and his own general knowledge of the elements going to establish value, and then employs the most appropriate method of determining valuation. Esposito v. Commissioner of Transportation, 167 Conn. 439, 441, 356 A.2d 175 [1974]; Textron, Inc. v. Wood, 167 Conn. 334, 345, 355 A.2d 307 [1974]. The trial court has the right to accept so much of the testimony of the experts and the recognized appraisal methods which they employed as he finds applicable; his determination is reviewable only if he misapplies, overlooks, or gives a wrong or improper effect to any test or consideration which it was his duty to regard." CT Page 8576Turgeon v. Turgeon, 190 Conn. 269, 274, 464 A.2d 1260
(1983).
The defendant argues that the court cannot assign any value to his participation in Multicare (other than an employment opportunity) because he has no ownership interest in it. The plaintiff argues that an equitable ownership interest of the defendant in Multicare can be recognized by the court. In addition, the defendant argues that the court can apply the resulting trust doctrine and find that Dr. Neil Sloane holds Multicare stock for the defendant (and that would also mean his two brothers) who possesses equitable title. The concept is intriguing. In a reported case in which this was applied in a dissolution of marriage framework it was found that the wife held the property at issue for the defendant and so such a resulting trust was found as between them. Whitney v. Whitney,171 Conn. 23, 24, 368 A.2d 96 (1976). Here, the asserted trustee, Neil Sloane has not been made a party to the action. If the doctrine were to apply he would be a real party in interest indispensable for the fashioning of relief. Horton v. Meskill,187 Conn. 187, 191 (1982). His absence as a party bars this court from inquiring further into the appropriateness of application of this doctrine to the present circumstances.
While there has been a significant reduction in income for the professional corporation, at least in part this is due to the defendant systematically shifting income into Multicare. Of course, the defendant is correct that the reduction is also due to the effects of managed care on his earning capacity. Both experts agree that the 37% drop (from 1993 to 1997) in combined gross revenues (the professional corporation and the Cheshire Multicare office) is due in most part to the effects of managed care. In considering what approach to valuation this court should embrace, the court considers that the method adopted must recognize that the defendant expends approximately half his time with Multicare and about half his time in the professional corporation, and that he decides which patients are seen in which entity, thereby controlling the flow of revenue between the two entities. The selection must also consider that the facilities of the chiropractic practice are all owned by sister entities. The rental expenses and administration expenses are paid by and between sister entities. (In fact, the charge of administration expenses by TRD in 1997 to the professional corporation in the amount of $44,463 is a disputed item between the parties and experts. In normalizing earnings, Mr. Pia removed this CT Page 8577 expenditure as not apparently justified. The defendant argues that it is a real expense for real services and should not be added back into earnings.)
The court accepts Mr. Harrison's valuation of Thomas F. Clukey, D.C., P.C. as of December 31, 1997 at $58,500.00 and so finds that to be the value of this corporation. It would seem very low given Dr. Clukey's historical earnings from the practice. However, this value reflects the movement of Dr. Clukey's practice into Multicare at a steady and certain pace.
The net asset approach as utilized by Mr. Harrison did not consider the Multicare patient fees receivables attributable to the defendant's Cheshire office. If those are adjusted for at $55,976, the net tangible assets valuation would produce a value of $119,100 for the business instead of $58,500. Those receivables are already in the pipeline with profit accruing back to the defendant, just as are the patient fees receivables of the professional corporation. Inclusion of these fees in the valuation would be consistent with Mr. Harrison's assertion in his report that Multicare ". . . was not created to build equity but to increase the earnings potential of the practitioners." (Exhibit 1, p. 6).
The plaintiff urges that the court may find in any case that the defendant has an equitable interest in Multicare that may be considered under Connecticut General Statutes
section 46b-81. The defendant concedes that while that equitable interest may exist, its value is unascertainable. In order for this asset to be considered property subject to consideration under 46b-81, this court must find that it is property as defined by our Supreme Court. Property for purposes of this statute has been defined as "the term commonly used to denote everything which is the subject of ownership. . . . Everything that has an exchangeable value or which goes to make up wealth or estate."Krafick v. Krafick, 234 Conn. 783, 794, 663 A.2d 365
(1995).
While the court in Krafick emphasized that the definition is meant to be broad and inclusive, there are limits to its application. As the Multicare ownership is presently structured, the defendant has no title interest. To date, he and his brothers have not had a doctor owning stock who they cannot keep in the background and let them run things. This control however is not a marketable item. It has no exchangeable value. CT Page 8578 The value that the defendant adds to Multicare is his professional goodwill. If he leaves he can take that with him but he cannot market and sell his professional goodwill. It is then not subject to distribution under 46b-81. It is nondistributable because it depends on the presence or reputation of the particular individual and represents nothing more than probable future earning capacity. . . ." Taylor v. Taylor,386 N.W.2d 851, 858 (Feb. 1986); Family Law and Practice, ed. Rutkin, p. 36-11.
The two experts agree that the combined result of operations of the two businesses produced a $60,000 profit for 1997. Almost all of this profit is from the Cheshire Multicare operation. The defendant has urged that this is repayment of losses from previous years. It is unrealistic to accept that he would make the financial investments that he has made in Multicare without owning it and without demanding the receipt of profit generated by his presence and presentation of his patients and their revenues to this business. The court finds that the $60,000.00 is a capital asset held by Multicare for the defendant.
Dexter Associates is a partnership made up of the defendant and his two brothers. They are each 1/3 partners. Dexter Associates owns real estate at 209 Boston Post Road, Milford. There are numerous tenants at this address. Among them are Ronald Clukey's private practice, his Multicare office and Multicare's administrative offices. Dexter Associates also owns the real property in Dexter, Maine in which the defendant's interest is valued at $3,333.00. Dexter Associates has been paying off the home-equity loan of $26,263.00 on the parties' home. The money borrowed had been used to aid in the business pursuits of the defendant.
For the premises at Cheshire, the defendant's Professional Corporation pays him rent of $3,000.00 per month rent. The Multicare Cheshire unit pays TRD rent of $2,400.00 per month. TRD then pays the PC $2,400.00 per month.
The defendant has contracted with Donald Dupont and/or Dupont Systems, Inc. to sell the Cheshire business property to a third party for $127,000.00. The contract provides for a one year leaseback at a rental of $2,100.00 with certain annual renewal rights. He has offered the plaintiff to purchase with the same terms as a right prior to Dupont. He says Dupont is aware of it and agrees. However, the contract with Dupont (Exhibit BBBBB) CT Page 8579 does not mention it. This contract is a violation of the pendente lite order restraining the transfer of assets.
TRD pays the administration costs, rent, insurance, paper goods, medical supplies and advertising of Multicare. TRD also does billings for the defendant's private practice. Therefore, Multicare Cheshire pays one-third of these expenses. Multicare Cheshire pays all of the other expenses particular to the Cheshire office, including the work of other service providers at the Cheshire office. The defendant is entitled to all of the profit generated by the Multicare Cheshire office after these payments.
Since its inception in late 1994, the defendant has received absolutely no income from Multicare. The defendant has testified that in 1997 his time working is divided one-half to Multicare and one-half to his Thomas F. Clukey, D.C., P.C ("D.C., P.C") Chiropractic practice. He has, in D.C. P.C. practice earned the following income.

Year Gross Revenue for D.C., P.C.
D.C., PC Compensation to Defendant
1992 $576,111 $262,000
1993 647,387 340,000
1994 571,940 334,000
1995 386,153 150,000
1996 333,729 116,000
1997 199,000 57,000

In 1996, the defendant estimated 60% of his time working was in the D.C., P.C. and 40% is Multicare. In Multicare he only works servicing patients. The administrative work is done by TRD.
The defendant's work schedule presently allows him to work four (4) days a week: Monday, Tuesday, Wednesday and Friday. These are very full days, with ten to eleven hours of work each day. He is on call for emergencies other days.
The defendant has recently hired other professionals at Multicare Cheshire: Dr. Lopez M.D. is paid $40,000.00 from Cheshire Multicare plus a percentage of gross receipts. Dr. Brook is being paid $40,000.00 from Cheshire Multicare.
TRD does not pay rent on an equal basis to the defendant and CT Page 8580 his two brothers.
It is unrealistic to think that the defendant would spend half of his professional time in 1997 working for Multicare withno income to show for it. His choice to do so is at best a poor business decision by him. His earning capacity must reflect what he can be earning, not what he is, or is not, being paid.
In 1998, the defendant is doing better financially according to his testimony. On his financial affidavit, he has stated that his gross income presently is:
$1,200.00/wk Multicare (est.) 300.00/wk D.C., P.C. 501.00/wk rent (gross) 136.00/wk interest, miscellaneous income ---------- $2,137.00/wk or $111,124.00/yr. gross income.
His testimony disclosed, that as of June, he had received no income from Multicare and very little income from his D.C, P.C. practice. Exhibit 14 discloses that the Cheshire Multicare office has $110,656.73 in gross revenues through the first five months. Extrapolating a twelve month figure from that, the yearly revenue is projected to be $265,574.00. The receipts in 1997 were $197,439.00. The expenses for five months are listed as $95,124.00, which includes $43,833 for administrative expenses to TRD. The total administrative expenses to TRD for 1997 were $44,643.00; total expenses were $134,544.
This court does not accept that the defendant will continue to generate revenues as he has in 1997 and 1998 without receiving fair compensation for the same. From all of the data presented to the court, considering revenues and expenses, including costs of managed care administration this court finds that the defendant has an earning capacity, at present, of $120,000.00 in gross income from his private practice and Multicare. The court recognizes that there has been the loss of some immediate return by way of revenue during the start up years of Multicare. The court is optimistic that the defendant's earning capacity will rise steadily as Multicare becomes a more established provider in the medical community. Because of this the court in its orders will require yearly reporting of income between the parties. CT Page 8581
 B. Real Estate
The real estate at 1083 WolfHill Road, Cheshire is residential real estate. The parties agree, and the court finds its fair market value is $230,000.00 with an equity after mortgage of $133,000.00.
The marital home is located at 20 Hidden Place, Cheshire. The court received expert testimony regarding the payments from P. Ball. His valuation of the property was $290,000.00. He did not note central air conditioning at the premises, although it is there. The husband contends the value of the premises is $320,000.00. There is a note secured by a mortgage on the premises with a balance of $26,263.12, which funds were utilized by Dr. Clukey for business purposes. Dr. Clukey has agreed that he or his business interest, Dexter Associates, will pay that note off. The court finds the value of the property to be $310,000.00.
The defendant owns his business property 15 Chipman Dr., Cheshire (an office property) and a one-third interest in 209 Boston Post Road, Milford. His interest in Chipman Drive is found to have a value of $137,000.00. The parties have a dispute as to the value of the Milford property. Expert testimony was offered. The court finds the fair market value of the defendant's interest to be $265,000.00.
The defendant owns a 1/3 interest in 7 acres in Dexter, Maine which the court finds the value to be $3,333.00.
 C. Deferred Compensation and Miscellaneous Assets and Liabilities
The parties have each listed various debts on their financial affidavits. There has been no serious challenge to the balances listed and the courts finds them to be accurate. The defendant is the owner of a certain life insurance policy which is detailed hereinafter in this decision.
The plaintiff is the owner of certain pieces of jewelry which the court finds to have a total value of $30,000.00.
Dr. Clukey received a loan repayment of $50,000.00 during the pendency of the action. He took the $50,000.00 and loaned it to his brother, David Clukey, at an extremely low interest rate. This was done in violation of the pendente lite order restraining the transfer of assets. Dr. Clukey also has a loan payable to him in the amount of $50,334.00 by one or more of the business entities (loan was to TRD for Multicare investment). CT Page 8582
The plaintiff is the title owner of a Fidelity Mutual Fund which she lists on her financial affidavit as valued at $106,195.00. The defendant is the title owner of a Fidelity Mutual Fund which he lists on his financial affidavit as having a present net value of ($519,949.00 less loan of $74,129) $445,820.00.
The defendant has a profit sharing plan with Pershing Co. to which he attaches a value of $875,000.00 in his financial affidavit. It appears from the parties' documentation that this value is as of year end 1997 and accepted by the court as such, there apparently being no updated value available.
The defendant owns 800 shares of Northeast Utility stock which was valued at $16.50 per share at trial for a total of $13,200. He owns 33 shares of Yankee Energy which at $22.00 per share is valued at $726.00. Finally, he owns a nominal amount of stock in Hawkins Energy.
The court accepts the values of these accounts and stocks as placed on the parties' respective financial affidavits. They are all creatures of the marketplace and therefore subject to fairly wild fluctuation in value at this time.
The defendant is the holder of a note due regarding condominium investments, the amount due to him and the value of the note found by the court to be $37,450.00.
The court has carefully considered all of the statutory criteria for the entry of orders regarding dissolution of marriage, child custody and visitation, child support and health insurance, alimony, property settlement issues (assignment of interest in the marital estate), and attorneys' fees (for the minor children and their parents) and expert witness fees. The court, in consideration of those criteria, as they apply, enters the following orders (and makes the following further findings, as may be necessary):
1. Dissolution of the marriage;
2. Sole legal custody of the minor children to the mother;
The four children shall all have visits with their father as follows: every other Friday night, and for dinner every Wednesday CT Page 8583 evening.
3. Ms. Clukey shall provide Dr. Clukey with a schedule of the children's activities at school and in the community as she receives it, so that he may attend events.
4. On Monday evening per week one child shall have dinner alone with their father on a four week cycle of rotation: Week # 1 Janna # 2 Paul # 3 Leigh # 4 Alison
5. Alison, being close the age of majority, will make her best efforts to attend visitation around her schedule.
6. The parties have stipulated and it is ordered that the family will engage in family therapy with Drs. Kyle and Marsha Kline. Pruitt. The costs, after insurance, are to be shared equally by the parties. The best interests of the children require that the family engage in this therapy. Therefore, Dr. Clukey's visitation shall be subject to termination or modification if he refuses to engage in family therapy. This court finds that it is essential to Ms. Clukey's sole custodial role that she engage in family therapy. Therapy for this family is to continue until it is satisfactorily completed or the court orders it is no longer necessary.
7. The defendant shall be the sole owner of his 100% stock ownership in Thomas F. Clukey, D.C., P.C. free and clear of any claim by the plaintiff.
8. The defendant shall pay to the plaintiff child support for the support of the four minor children in the amount of $537.00 per week. The court notes that the parties' income as computed by it exceeds the maximum in the Child Support Guidelines. The court has found the defendant's earning capacity to be $120,000 per year from his chiropractic work and he has rental income. The court has imputed a modest 8% per year income return on the Fidelity accounts ordered to each party. This child support order exceeds the presumptive minimum combined family support order in the Guidelines for four minor children of $632.00 when allocation is made in accordance with the findings in this opinion.
9. The defendant shall pay to the plaintiff alimony in the CT Page 8584 amount of $250.00 per week, which shall sooner terminate upon the death of either party, the plaintiff's remarriage, or her cohabitation with a male as defined by statute and case law. As additional alimony, the defendant shall pay the COBRA premiums to maintain health insurance for the plaintiff as long as she is statutorily permitted to COBRA coverage. Pursuant to Lake v.Lake, Conn. App. (1998) the court has considered the cost of this obligation and deemed it affordable by the defendant even if it results in an additional premium as costly as that currently carried on his business ledger for the entire family.
For so long as the defendant has an alimony or child support obligation to the plaintiff, the parties shall annually exchange their W-2s, 1099s, K-1s and the like by February 15 each year, and, shall provide each other their federal tax return within five days of filing it.
10. The defendant shall be the owner of the life insurance he currently has in the face amount of $750,000.00. He shall name the minor children and the plaintiff as beneficiaries in equal shares so long as he has a child support or alimony obligation for them, respectively, both as to current orders and as to any arrearage that may accrue.
The defendant, therefore, is the sole owner of the cash value of that policy in the amount of $85,884.00 and shall not increase the loan past its current indebtedness of $19,644. Annually, the defendant shall provide the plaintiff proof of his compliance with these provisions, commencing with thirty days after the entry of this decree.
The court finds that the defendant must be insurable because the policy is currently in effect, and, given his history of ability to carry this policy, the court finds its premium cost implicitly reasonable. The present premium cost is $7,540 annually (Exhibit B). The court finds that the defendant has the ability to pay this.
11. The court orders the defendant to maintain health insurance as it is currently in effect for the benefit of the four minor children during the minority. He shall be wholly responsible for the premium cost. The court finds this provision inherently reasonable, as it is an obligation that the defendant has historically undertaken and agreed to continue. CT Page 8585
The parties shall each pay one-half of all health expenditures of the minor children that are not paid by their insurance. If the defendant fails to maintain the health insurance ordered herein, he shall be 100% responsible for these expenses. Health expenditures is to be broadly construed to include but not be limited to medical, dental, orthodontic, hospitalization, psychological, psychiatric, pharmaceutical, optometric, eyeglasses, contact lenses, opthalmologic, etc.
12. The court orders the defendant to transfer all of his right, title and interest in and to the real estate at 20 Hidden Place, Cheshire to the plaintiff within 30 days. He is solely responsible for the repayment of the home equity line secured on the premises and shall pay the obligation off as it comes due or sooner, and, indemnify and hold the plaintiff harmless on the same.
13. The defendant shall own, free and clear of any claim of the plaintiff all of his interest in and to the following pieces of real estate:
 a. 1083 Wolf Hill Road, Cheshire; b. 15 Chipman Drive, Cheshire; c. 209 Boston Post Road, Milford; d. 7 acres, Dexter, Maine;
14. The defendant shall be the sole owner of the 18 1/2 foot sunbird boat. The court finds the value of that boat and the hauling trailer combined to be $6200.
15. The defendant is ordered to pay Dr. Collins' bill of $875 within 30 days of the entry of this decree.
16. The minor children's attorney's bill is approved in the amount of $18,957.75 which after credits for amounts paid leaves $4,500.00 as balance due after credits applied. Credits applied were for the plaintiff in the amount of $6,422.75 and for the defendant in the amount of $8,035.00. The parties are each ordered to pay one-half of the whole bill, which, therefore is $9,478.88 before credits. The plaintiff's balance due of this is $3,056.13 and the defendant's balance due is $1,443.88; both balances shall be paid in full within 21 days of the entry of the decree.
17. The defendant shall be the sole owner of all of the CT Page 8586 household furnishings at his home at 1083 Wolf Hill Road, Cheshire.
18. The plaintiff shall be the sole owner of the household furnishings at 20 Hidden Place, Cheshire with the exception of the items stipulated to by the parties during the trial which list of items are ordered the defendant's provided he makes arrangements to pick them up within 90 days when NO children are home or present. The defendant seeks an order of the court ordering the return to him of a certain firearm; the court declines to enter such an order.
19. The defendant shall be the sole owner of the 1986 Ford E150 and the 1990 Cadillac Deville. The truck is valued by the court at $500. The court notes that the defendant declared the Cadillac at a value of $10,000 one year ago (exhibit A) and $1,000 for this hearing. No evidence suggested it had suffered a calamity. The court finds its value to be $3,500. The plaintiff shall be the sole owner of the 1998 Chevrolet Tahoe, which the court finds the value to be $28,000. Each party shall execute whatever documents are necessary to transfer ownership and registration of these vehicles consistent with this decision.
20. The plaintiff is ordered the sole owner of her Fidelity Mutual Fund account and her personal New Haven Savings Bank accounts free and clear of any claim of the defendant.
21. There is a Merrill Lynch Ready Asset Trust listed on the plaintiff's affidavit with a value of $16 attached. This is ordered the plaintiff's. There is apparently a time share owned by the parties at Inverness by the Sea, Texas, as listed on the plaintiff's financial affidavit as an asset of unknown value (expenses are also listed.). It is ordered the plaintiff's solely.
22. The plaintiff is ordered the sole owner of her jewelry which is in her possession.
23. The defendant is the sole owner, free and clear of any claim of the plaintiff, his loan to TRD/Multicare in the amount of $50,334.00, his loan to David Clukey in the amount of $50,000.00, the condominium note balance in the amount of $36,450.00, the cash value of his CIGNA life insurance $66,240, his Northeast Utilities stock, Yankee Energy stock, and Hawkins Energy stock. CT Page 8587
24. The plaintiff shall be the sole owner by Qualified Domestic Relations Order (QDRO) of one half of the defendant's profit sharing plan valued as of the date of the filing of these orders. All accruals and losses to that one-half from the valuation date forward are the plaintiff's asset or loss. The balance of the profit sharing plan fund shall belong to the defendant. The court will retain jurisdiction over the QDRO for purposes of its effectuation in accordance with these orders.
25. The defendant shall transfer to the plaintiff $360,000.00 from his Fidelity account within 10 days of the filing of this decree. If he fails to do so or files an appeal such that the execution of this order is stayed, then the defendant shall pay to the plaintiff the greater of $98.11 for each day the transfer is delayed or the actual increase in value of those funds from the date of filing of the decree to the actual date of transfer. The balance of the defendant's Fidelity account is the defendant's property free and clear of any claim of the plaintiff.
26. The defendant is the sole owner of the miscellaneous bank accounts he has at Webster Bank and the credit union free and clear of any claim of the plaintiff.
27. There is a certain Toyota listed on the defendant's affidavit and certain insurance checks the plaintiff asserts the defendant has. Notwithstanding the controversies surrounding these matters, without finding which party is ultimately `right' this court exercising its equitable powers orders these items to be the property of the defendant, free and clear of the plaintiff, to the extent these items continue to be in one of the parties' possession. Because of the history of the parties with these matters and their entanglement with Monica regarding them this trial court makes clear for any future court that it would be unfortunate if any enforcement powers of the court were invoked or exercised to enforce this particular order.
28. The defendant is ordered to pay counsel fees to plaintiff's counsel in the amount of $10,000.00 within 30 days. This order is made in consideration of the statutory criteria, the `mosaic' of the financial orders and the need to not do violence to their structure, and most importantly the following. This court finds that during the discovery process Dr. Clukey intentionally feigned ignorance on issues regarding his business CT Page 8588 and Multicare and was noncompliant in his production of many documents regarding the same until the time of trial. This caused the plaintiff to spend far more in counsel fees than would otherwise have been required.
29. Except as stated in the above orders each party is responsible for their respective debts as listed on their financial affidavits.
30. Each party is ordered to sign whatever documents are necessary, and as presented to them, by the other party to effectuate these order
Munro, J.